1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CNET NETWORKS, INC.

                  Plaintiff,

      v.

ETILIZE, INC.

              Defendant.

_____/

No. C 06-05378 MHP

**MEMORANDUM  & ORDER**

**Re: Defendant's Motion for Summary Judgment**

      Plaintiff CNET Networks, Inc. ("CNET") brought this action against defendant Etilize, Inc. ("Etilize") for infringement of United States Patent No. 6,714,933 ("the '933 patent") and United States Patent No. 7,082,426 ("the '426 patent").  The '426 patent is a continuation in part of the '933 patent, which claims methods and systems for automatically creating an electronic catalog of product information gathered from various internet websites.  Now before the court is defendant's motion for summary judgment of non-infringement of plaintiff's '933 and '426 patents because first, all of defendant's allegedly infringing activities occur outside the United States in Pakistan and therefore no liability attaches under 35 U.S.C. § 271(a); and second, because the catalog imported into and used by customers in the United States is not a "product" within the meaning of 35 U.S.C. § 271(g).  Having considered the submissions and arguments of the parties, the court enters the following memorandum and order.

BACKGROUND

      Plaintiff CNET provides customers a central shopping portal from which they can search for product information and purchase products from a variety of vendors.  Pl.'s Opp. at 2.  To this end,

CNET owns intellectual property in the field of automated content aggregation, catalog generation and online commerce. Id. The CNET patents at issue in this action are the '933 patent and its continuation-in-part, the '426 patent. In its Infringement Contentions, CNET asserts that Etilize infringes claims 1, 15, 28, 29, 36 and 38 of the '933 patent and claims 1, 14, 16, 20, 23, 24, 39, 52, 60 and 95 of the '426 patent. Def.'s Mtn. at 5–6. Seven of these claims—claims 1 and 28 of the '933 patent and claims 1, 39, 52, 60 and 95 of the '426 patent—are independent claims, and the remainder are dependent claims. The seven independent claims can be generally arranged in five groups, two of which are method claims and three of which are purported "system" claims:

<u>Method Claims</u>

1.  a method for aggregating product information from a plurality of sources in a networked computer environment (claim 52 of the '426 patent and claim 1 of the '933 patent);

2.  a method for creating a product catalog stored on computer readable media (claims 1 and 39 of the '426 patent);

<u>System Claims</u>

3.  a system for aggregating product information from a plurality of sources in a networked computer environment (claim 95 of the '426 patent);

4.  a system for creating a product catalog (claim 60 of the '426 patent); and

5.  a computer architecture for effecting commerce in a networked environment comprising of
    a.  a client computer;
    b.  a merchant server;
    c.  a manufacturer server;
    d.  a shopping server that includes a memory device capable of storing a product database and that is operative to provide a crawler for visiting a plurality of sources hosted on the merchant and manufacturer servers; and
    e.  a communication channel coupling the shopping server to the merchant and manufacturer server, and coupling the shopping server to the client computer
    (claim 28 of the '933 patent).

Farooqui Dec., Exh. A ('933 patent) & Exh. B ('426 patent).

Defendant Etilize is a Delaware corporation that markets and sells electronic product catalogs stored on a server. Hameed Dec. ¶ 6; Amended Joint Statement of Undisputed Facts ¶ 1. The catalogs contain product information—such as price, general descriptions, detailed

2

specifications, unique product IDs, and images—collected from the public websites of many

different manufacturers and suppliers.  Hameed Dec. ¶ 4; Mitchell Dec., Exh's. F & G.  Etilize

markets and sells the product catalog to distributors and retailers like CompUSA who, in turn, offer

for sale to end-users various products such as digital cameras and computers.  Id.  Rather than create

a catalog of available products on its own, customers such as CompUSA pay Etilize for a

subscription service called SpeX, which gives them the right to access and use the Etilize catalog.

Hameed Dec. ¶ 4–5.  The product catalog is a data file, either in comma delimited or XML format.

Hameed Dec. ¶ 6; Mitchell Dec., Exh's. F & G.  Using an FTP client, the catalog, i.e. the data file, is

electronically transmitted from a remote server to the customer's local hard drive.  Id.  After the data

file is downloaded and installed on the customer's computer, the file is imported into the customer's

own database software application so that it may be searched.  Id.  The catalog is currently located

on a server in Canada, but from 2003 until March 2007, the catalog was made available on a server

located in Los Angeles[1].  Hameed Dec. ¶ 6.

     All of the product information contained in the Etilize catalog is collected by Etilize-

Pakistan, a separate Pakistani corporation located in Karachi, Pakistan.  Hameed Dec. ¶ 8; Exh. A

("Master Services Agreement").  Pursuant to an agreement between Etilize and Etilize-Pakistan,

Etilize owns the product catalog, but Etilize-Pakistan performs the work to collect the information

and assembles it into a catalog.  Id.; Mitchell Dec., Exh. K, Hameed Dep. 80:3–5.  Etilize-Pakistan

employs human operators in Pakistan who visit vendor websites, one at a time, to collect the

relevant product information and enter it into a template which is then entered into the catalog.

Hameed Dec. ¶ 8.  In some circumstances, Etilize-Pakistan's employees create and execute

computer programs in Pakistan to automatically obtain and extract information from a website.  Id.

LEGAL STANDARD

     Summary judgment is proper when the pleadings, discovery and affidavits show that there is

"no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

UNITED STATES DISTRICT COURT
For the Northern District of California

case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. <u>Id.</u> The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Cattrett</u>, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u>

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. <u>Id.</u>; <u>Gasaway v. Northwestern Mut. Life Ins. Co.</u>, 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. <u>Masson v. New Yorker Magazine</u>, 501 U.S. 496, 520 (1991); <u>Anderson</u>, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

DISCUSSION

Defendant Etilize moves for summary judgment of non-infringement on two separate bases. First, Etilize argues that it does not infringe CNET's patents because neither it nor its customers "use" the claimed systems "within the United States" as required under section 271(a). Second, Etilize argues that it does not infringe CNET's patents because the catalog it imports into the United States, although "made by" methods and systems claimed in the '933 and '426 patents, is nevertheless not a "product" within the meaning of section 271(g).

4

UNITED STATES DISTRICT COURT
For the Northern District of California

I.       Section 271(a)

Section 271(a) of title 35 sets forth the requirements for a claim of direct infringement of a patent.  It provides:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a).  The territorial reach of section 271(a) is limited since the section is only applicable to patent infringement that occurs within the United States.  NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1313 (Fed. Cir. 2005).

"Under section 271(a), 'use' of a patented method or process is fundamentally different from 'use' of a patented system or device."  Id. at 1317.  Use of a *method* claim does not give rise to infringement under section 271(a) unless each step or stage of the claimed method is performed within the United States.  Id. at 1318.  Use of a *system* claim, however, may give rise to infringement under section 271(a) if this country is "the place at which the system as a whole is put into service," in other words, the United States is "the place where control of the system is exercised and beneficial use of the system obtained."  Id. at 1317.  Even if some part or component of a system is located outside the United States, infringement may still occur under section 271(a) as long as the "situs of 'use'" of the system is inside the United States.  See id. at 1317.

In NTP, the patent claimed was "a system for transmitting originated information from one of a plurality of originating processors in an electronic mail system to at least one of a plurality of destination processors in the electronic mail system."  Id. at 1294.  This patent was embodied in the BlackBerry wireless email devices sold by defendant Research in Motion ("RIM") to customers in the United States.  Id. at 1289.  Defendant RIM argued for non-infringement under section 271(a) because the BlackBerry Relay component of the accused system was located in Canada.  Id. at 1313.  The court rejected this argument, holding that "[w]hen RIM's United States customers send and receive messages by manipulating the handheld devices in their possession in the United States, the location of the use of the communication system as a whole occurs in the United States."  Id. at 1317.  RIM's U.S. customers "controlled the transmission of the originated information and also

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  benefitted from such an exchange of information." Id. at 1317.  The location of the Relay in

2  Canada, therefore did not preclude infringement of the system claim under section 271(a).  Id.

3       In this case, CNET does not contend that Etilize infringes the *method* claims under section

4  271(a) because under NTP, every step of the method must be performed within the United States for

5  infringement to arise.  Instead, CNET argues that Etilize infringes the *system* claims because use of

6  the system as a whole occurs within the United States, even though some components of the system

7  are located abroad.  CNET argues for indirect infringement under 271(b) because Etilize induces

8  both Etilize's customers and Etilize-Pakistan to use the system, and in addition, CNET argues for

9  direct infringement under section 271(a) because Etilize itself uses the system within the United

10  States.  The court will address each theory of infringement below.

11       CNET argues that Etilize's customers directly infringe the system claims because they use

12  and download the product catalog within the United States.  Accordingly, CNET argues, Etilize is

13  liable for indirect infringement under section 271(b) because by making the catalog available to

14  customers and by selling the SpeX subscription service that allows customers to access the catalog,

15  Etilize induces its customers' infringement.  The system claims, however, are for aggregating

16  product information and creating a product catalog, both of which have been completed at the time

17  the customer downloads and uses the catalog.  The data collection and catalog creation occur

18  statically, prior to and independent of the customer's download.  They do not occur dynamically, in

19  response to and only as a result of a customer downloading or using the catalog.  This is not a case

20  like NTP where each time the customer used the BlackBerry device to send and receive email, the

21  customer was also using the claimed system for transmitting the email.  Here, customers use the

22  result of the system—the product catalog—not the system itself.  The court concludes that because

23  Etilize's customers do not use the claimed system, the customers cannot directly infringe the system

24  under section 271(a).  Accordingly, Etilize does not induce its customers to infringe by making the

25  SpeX subscription service available and by providing user-names and passwords that allow access to

26  the catalog.  The court concludes Etilize cannot be indirectly liable for its customers' use of the

27  catalog under section 271(b).

28

UNITED STATES DISTRICT COURT
For the Northern District of California

CNET argues in the alternative that Etilize-Pakistan directly infringes the system claims because until March 2007, the catalog was stored on a server located in the United States, and when aggregating the product information, Etilize-Pakistan visited various merchant and manufacturer websites that are also located on servers in the United States. The situs of use of the system as a whole, however, is Pakistan, not the United States. The product information is aggregated, assembled and organized in Pakistan. The human operators who visit the websites to collect product information are located in Pakistan, as are the employees who develop the software to collect the data automatically. Although the data collection process may involve visiting a merchant or manufacturer website located on a server in the United States, the situs of use of the system is still Pakistan because the website visit is initiated either by human operators in Pakistan or by computer code written by engineers in Pakistan and executed from a server in Pakistan. Likewise, the creation of the catalog occurs in Pakistan because once the information is collected and organized, a "master" catalog is generated and stored on a server located in Pakistan.

CNET makes much of the fact that additional copies of the catalog are transmitted to servers in the United States. But as previously mentioned, the system claims speak only to data collection and catalog creation, both of which are complete at the time a customer or Etilize initiates a download. Even assuming that the system claims speak to transmission and storage of a copy abroad once the master catalog is created and stored in Pakistan, this is still only one component of the system, the whole of which is put into service in Pakistan. That a copy of the catalog is located on a server in the United States, therefore, does not change the fact that overall control of the data collection and catalog creation is exercised from Pakistan. The court concludes that because Etilize-Pakistan does not use the system "within the United States" as required under section 271(a), Etilize-Pakistan does not directly infringe the system. Accordingly, Etilize does not induce Etilize-Pakistan to infringe even if, as asserted by CNET, Etilize instructs and directs Etilize-Pakistan on what product information to collect and how to collect it[2]. The court concludes that Etilize is not indirectly liable under section 271(b) because Etilize-Pakistan does not directly infringe under section 271(a).

UNITED STATES DISTRICT COURT
For the Northern District of California

As a final basis for liability, CNET argues that Etilize directly infringes because 1) Etilize, like its customers, downloads and uses the catalog and 2) Etilize directs its management, sales and marketing operations from within the United States. As to the first theory of Etilize's direct infringement, the court has already explained that use of the catalog—the result of the system—is not use of the system itself. As to the second theory of Etilize's direct infringement, the patent claims do not speak to these types of business activities. Rather, they speak to information aggregation and catalog creation, both of which occur in Pakistan. In sum, the court concludes that there are no genuine issues of material fact as to whether, under section 271(a), Etilize directly or indirectly infringes the method or system claims. The court grants Etilize's motion for summary judgment of non-infringement under section 271(a).

II.     Section 271(g)

Section 271(g) of title 35 sets forth a basis for infringement in situations where the patented process is used abroad, but where the product made by the patented process is imported, sold or used within the United States. It provides:

> Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale or use of the product occurs during the term of such process patent.

35 U.S.C. § 271(g). The Federal Circuit has interpreted the term "made" as used in section 271(g) to mean "manufactured" and the term "product" to mean a "physical article." Bayer AG v. Housey Pharmaceuticals, Inc., 340 F.3d 1367, 1377 (Fed. Cir. 2003).

In Bayer, the defendant Housey owned a patent claiming "a method of screening for substances which specifically inhibit or activate a particular protein affecting the cultural or morphological characteristics of the cell expressing the protein." Id. at 1369. The court described the disclosed method as a research "process for identifying the effect that different agents have on the activity of the suspect protein." Id. Housey accused plaintiff Bayer of infringing the patent under section 271(g) because first, Bayer imported into the United States knowledge and

information reflecting identification or characterization of a drug acquired from using the patented research methods; and second, Bayer imported into the United States a drug that was determined to be an inhibitor or activator of a target protein using the patented methods. Id. at 1370. The court held that the claimed method produced "information in the abstract," i.e. "knowledge that a substance possesses a particular quality," and that mere information and knowledge were not physical goods. Id. at 1376–1377. The information generated by the method therefore was not a "product" within the meaning of section 271(g). Id. Moreover, although the drugs were physical goods, they were not "made by" the patented process because "the process must be used directly in the manufacture of the product, and not merely as a predicate process to identify the product to be manufactured." Id. at 1378. Although the drug was identified as useful through the use of the patented research method, the process of identification and generation of data were not steps in the actual manufacture of the final drug product. Id. at 1377.

Following Bayer, the Federal Circuit re-visited section 271(g) in the NTP BlackBerry case. The district court in NTP held that "'wireless electronic email' specially formatted by a patented process" is a product under section 271(g). NTP, 418 F.3d at 1323. On appeal to the Federal Circuit, defendant RIM argued that the product created by the NTP process is data or information, which according to Bayer is not protected under section 271(g). Id. Plaintiff NTP argued that the "email packets" being transmitted had a "'tangible' structure which include[d] the interface address, [a radio frequency] address, and the inputted message." Id. Moreover, NTP argued that "the transformation of data can produce a tangible result, that [defendant] RIM transforms data by moving email through the network, and that the tangible result of the transformation is a product under section 271(g)." Id. NTP added that RIM "manufactures" email into its tangible structure and "imports" email using NTP's patented processes. Id.

The Federal Circuit held in NTP that "the district court erred in not holding as a matter of law that section 217(g) was inapplicable to the asserted method claims," Id. at 1324, which were "directed to methods for the transmission of information in the form of email messages." Id. at 1323. The Federal Circuit reasoned that "[b]ecause the 'transmission of information,' like the

1  'production of information' [at issue in Bayer], [did] not entail the manufacturing of a physical

2  product, section 271(g) [did] not apply to the asserted method claims." Id.  The court further

3  explained that in Bayer, there was no doubt that a process producing research data was patentable

4  under section 101. Id. at 1324; 35 U.S.C. § 101 ("Whoever invents or discovers any new and useful

5  process ... may obtain a patent therefor").   Nevertheless, sections 101 and 271(g) are not

6  coextensive in their scope. NTP, 418 F.3d at 1324.  Although a process may be patentable under

7  section 101, section 271(g) does not cover every patentable process and its purported result. Id.

8  Thus, even though a process may be patentable under section 101 because it produces a tangible

9  result, the Federal Circuit rejected this "tangible result" test for section 271(g) in Bayer when it held

10  that research data—a "tangible result" for section 101 purposes—did not garner the protection of

11  section 271(g) because it was not a physical product.

12      In this case, the parties do not dispute that the catalog is "made by" the patented methods or

13  systems.  Indeed, the claims describe a method or system for *creating* a product catalog.  Unlike

14  Bayer, where the patented process was not used in the actual manufacture of the drug, the patented

15  process in this case is directly used to manufacture the catalog.  In other words, while practicing

16  each step of the research method in Bayer did not lead to the creation of a drug, practicing each step

17  of the method in this case leads directly to the creation of a catalog.  There is also no genuine issue

18  of material fact that by downloading and using the catalog for its own sales and marketing purposes,

19  Etilize "imports" and "uses" the catalog and may directly infringe under section 271(g).  Likewise,

20  there is also no genuine issue of material fact that by inducing its customers to download and use the

21  catalog, Etilize may indirectly infringe under section 271(g).

22      The main issue for the court, then, is whether the catalog is a "product" within the meaning

23  of section 271(g).  Defendant Etilize argues that the only product that is ever present and sold in the

24  United States is the SpeX subscription service allowing access to and transmission of the catalog

25  information.  Characterizing the relevant product in this case as "access to information," defendant

26  Etilize argues that like the "production of information" in Bayer and the "transmission of

27  information" in NTP, the SpeX subscription service is not a "product" within the meaning of section

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    271(g). This, however, is not an accurate characterization of the facts and simply confuses the

2    relevant legal issue. First, the relevant object for the court's analysis is the object made by the

3    patented process—the catalog, not the subscription service. Second, the catalog, i.e. the data file, is

4    in fact an object that is present in the United States because the file is downloaded onto the local

5    hard drives of computers owned by customers in the United States. Not only is the catalog present

6    in the United States, but as required under section 271(g), it is imported and sold in this country by

7    Etilize and is also used by Etilize's customers in the United States. Despite Etilize's attempts to

8    confuse the issue, the relevant question for the court is not whether *SpeX*—the subscription

9    service—is a physical good, but whether the *catalog* is a physical good and therefore a "product"

10   within the meaning of section 271(g).

11        CNET argues that the Supreme Court's recent opinion in <u>Microsoft v. AT&T</u>, 127 S.Ct. 1746

12   (2007), although not directly on point, is instructive for the issue of whether an electronic product

13   catalog is a physical good. In <u>Microsoft</u>, the issue before the court was whether software is a

14   combinable "component" for purposes of section 271(f). <u>Id.</u> at 1755. The court stated that software

15   "abstracted from a tangible copy" is simply abstract information. <u>Id.</u> Only when expressed and

16   stored as machine-readable object code, e.g. burned on a CD-ROM or written to a server hard drive

17   such that it is capable of being downloaded from the internet, does software become an actual,

18   physical component amenable to combination. <u>Id.</u> at 1756. The court held that "a copy of Windows

19   [software], not Windows in the abstract, qualifies as a 'component' under § 271(f)." <u>Id.</u>

20        This court agrees with CNET that <u>Microsoft</u> is instructive for the concept that an electronic

21   catalog, like computer software, is not simply an intangible collection of information, but can also

22   be thought of as having a physical, tangible embodiment once it is expressed and stored on computer

23   readable media in the form of magnetic fields on a hard drive or etchings on a CD-ROM. The

24   catalog in this case, therefore, is distinguishable from the abstract information at issue in <u>Bayer</u>. The

25   claims in this case are directed toward *creation* of a product catalog *stored on computer readable*

26   *media*, not the identification of whether a particular substance inhibits or does not inhibit a particular

27   protein. In other words, the electronic catalog in this case, far from being abstract information or

28

11

knowledge, is a physical article no different from a product catalog manufactured and assembled on paper bound with stitching, glue or staples. The court holds that the catalog is a "product" within the meaning of section 271(g) which is "made by" CNET's patented processes and is "imported" and "used" in the United States by Etilize and Etilize's customers. Accordingly, the court denies Etilize's motion for summary judgment of non-infringement under section 271(g).

For several reasons, NTP is distinguishable from this case and does not disturb the court's conclusion. The Federal Circuit's holding in NTP was a general proposition that section 271(g) was "inapplicable" to the asserted method claims. The Circuit found that the claims were directed to the "transmission of information in the form of email messages" and that the transmission of information did not entail the manufacture of a physical product. The Circuit, however, did not specify whether its holding was based on the fact that transmission did not involve manufacturing or whether electronic mail was not a physical good. Moreover, although the district court found that electronic mail *was* a physical good, the Circuit did not specifically reverse or affirm the district court's holding. Instead, the Circuit stated that the district court erred in general by not holding that section 271(g) was "inapplicable."

To the extent that the Circuit's holding was based on the fact that the claims in NTP were directed to the transmission of email messages, NTP is distinguishable because the claims in this case are directed to the *creation and manufacture* of a catalog, not to its *transmission or delivery*. To the extent that the Circuit's holding was based on the fact that the email messages in NTP, though tangible, were nevertheless not physical products, this case is still distinguishable. While email messages are not products that are bought and sold, a catalog—whether its physical form is etchings on a CD-ROM, magnetic fields in a server, or ink on paper—is a product that is bought and sold. When passing section 271(g), Congress was concerned about patented processes whose commercial value is derived from the sale of the resulting product. Mitchell Dec., Exh. U, "Process Patents: Hearing Before the Subcomm. on Patents, Copyrights and Trademarks of the S. Comm. on the Judiciary," 99th Congress at 11 (1985) ("When the chief commercial value of the process comes from the use or sale of the resulting product, sale of the foreign-made products may effectively

12

destroy the value of the U.S. process patent and perhaps the patent holder's ability to recover an initial R&D investment."). While Congress may not have intended for section 271(g) to protect email that is not bought and sold, Congress did intend for section 271(g) to protect a product catalog that is bought and sold. The value of CNET's process lies in the method by which a product catalog is created, and that value is captured by the sale of the catalog.

CONCLUSION

Defendant's motion for summary judgment of non-infringement under section 271(a) is GRANTED. Defendant's motion for summary judgment of non-infringement under section 271(g) is DENIED.

IT IS SO ORDERED.

Dated: November 26, 2007

MARILYN HALL PATEL
Judge
United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

13

ENDNOTES

1.  Subsets of the catalog, some of which are used by Etilize's customers and some of which are used by Etilize itself for marketing and demonstration purposes, are currently located on various U.S.-based servers.

2.  CNET argues that Etilize and Etilize-Pakistan are not separate entities and that Etilize-Pakistan is in fact an overseas branch of Etilize which is incorporated in the United States.  This argument, however, does not disturb the court's analysis.  Even assuming that Etilize and Etilize-Pakistan are one and the same, the location of the *entity's incorporation*, which may be in the United States, does not change the fact that the location of the *infringing activity* is still Pakistan.

UNITED STATES DISTRICT COURT
For the Northern District of California

14