UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CNET NETWORKS, INC.,

                Plaintiff,

     v.

ETILIZE, INC.,

           Defendant.

_____/

No. C 06-05378 MHP

**MEMORANDUM & ORDER**

**Claim Construction Memorandum and Order for United States Patent Nos. 6,714,933 and 7,082,426.**

Plaintiff CNET Networks, Inc. ("CNET") brings this action against defendant Etilize, Inc. ("Etilize") alleging infringement of U.S. Patent Nos. 6,714,933 ("the '933 patent") and 7,082,426 ("the '426 patent").  The '426 patent is a continuation-in-part of the '933 patent, which claims a method and system for aggregating content for an online purchasing system.  Now before the court are the parties' claim construction briefs, filed pursuant to Patent Local Rule 4–5.  Having considered the parties' arguments and submissions, and for the reasons set forth below, the court construes the disputed terms as follows.

BACKGROUND

This dispute concerns patented methods and systems for aggregating content for online purchasing and cataloging systems.  Plaintiff CNET is a digital media company which provides customers with, among other things, standardized, easily searchable product information and a single shopping portal for purchasing products from a variety of vendors.  Plaintiff's Opening Brief

("POB") at 4. CNET currently owns two patents in this area. The '933 patent is entitled "Content Aggregation Method and Apparatus for On-line Purchasing System." The '426 patent is entitled "Content Aggregation Method and Apparatus for an On-line Product Catalog." These two patents integrate a plurality of products from online merchants into a single online interface in order to facilitate comparison shopping amongst merchants. Additionally, the patented inventions disclose a method for gathering the product information from a networked computer environment into a database system.

Defendant Etilize is a Delaware corporation that markets and sells electronic product catalogs stored on a server. The catalogs contain product information—such as price, general descriptions, detailed specifications, unique product IDs, and images—collected from the public websites of many different manufacturers and suppliers. Etilize markets and sells these product catalogs to distributors and retailers who, in turn, offer various products, such as digital cameras and computers, for sale to end-users. Rather than create a catalog of available products on their own, customers pay Etilize for a subscription service called SpeX, which gives them the right to access and use the Etilize catalogs.

All of the product information contained in the Etilize catalog is collected by Etilize-Pakistan, a separate Pakistani corporation located in Karachi, Pakistan. Etilize-Pakistan employs human operators in Pakistan who visit vendor websites, one at a time, to collect the relevant product information and enter it into a template which is then entered into the catalog. In some circumstances, Etilize-Pakistan's employees create and execute computer programs in Pakistan to obtain and extract information from a website.

LEGAL STANDARD

Under Markman v. Westview Instruments, Inc., 517 U.S. 370, 389-90 (1996), the court construes the scope and meaning of disputed patent claims as a matter of law. Claims are construed from the standpoint of a person having ordinary skill in the art. Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1298 (Fed. Cir. 2003). The Federal Circuit has stated that in any

2

claim construction analysis, courts should first look to the intrinsic evidence. Vitronics Corp. v.

Conceptronic, Inc., 90 F.3d 1576, 1582–84 (Fed. Cir. 1996). Intrinsic evidence includes the patent

claims, the specification, and the prosecution history, which includes the prior art cited therein, in

order to determine the meaning of the patent claims. Id. at 1582–84; see also Phillips v. AWH

Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc). If analysis of the intrinsic evidence resolves

any ambiguity in disputed claim terms, then "it is improper to rely on extrinsic evidence."

Vitronics, 90 F.3d at 1583 (citing Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216

(Fed. Cir. 1995)). Extrinsic evidence, such as expert testimony, dictionaries, and treatises, may be

used only if ambiguities remain after analyzing all the intrinsic evidence. Vitronics, 90 F.3d at

1584.

The first step of the claim construction analysis requires the court to look to the intrinsic

evidence, beginning with the words of the claims themselves. Teleflex, Inc. v. Ficosca N. Am.,

299 F.3d 1313, 1324 (Fed. Cir. 2002); see also Phillips, 415 F.3d at 1315 ("the claims themselves

provide substantial guidance as to the meaning of particular claim terms"). According to the Federal

Circuit, the court must "indulge a heavy presumption that a claim term carries its ordinary and

customary meaning." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)

(internal quotations omitted). This is "the meaning that the term would have to a person of ordinary

skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313. The claims of a

patent "must [also] be read in view of the specification, of which they are a part." Id. at 1315. The

specification may help resolve ambiguity where the words in the claims lack clarity. Teleflex,

299 F.3d at 1325. Yet, the written description "should never trump the clear meaning of the claim

terms." Comark Commc'n, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (citations

omitted); see also Tate Access Floors, Inc. v. Maxess Techs., Inc., 222 F.3d 958, 966

(Fed. Cir. 2000) ("[a]lthough claims must be read in light of the specification of which they are part,

. . . it is improper to read limitations from the written description into a claim"). By expressly

defining terms in the specification, an inventor may "choose[] to be his or her own lexicographer."

Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999). Finally, a

court may examine the prosecution history to determine whether the patentee intended to deviate from a term's ordinary and customary meaning. <u>Teleflex</u>, 299 F.3d at 1326. The prosecution history may "limit[] the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." <u>Id.</u> (quoting <u>Standard Oil Co. v. Am. Cyanamid Co.</u>, 774 F.2d 448, 452 (Fed. Cir. 1985)).

If, after examining all the intrinsic evidence, ambiguities in the claim terms remain, a court may look to extrinsic evidence. Dictionary definitions and other objective reference materials available at the time that the patent was issued may help illuminate the meaning of a claim. <u>Phillips</u>, 415 F.3d at 1322; <u>Texas Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1202 (Fed. Cir. 2002). A dictionary "has the value of being an unbiased source, accessible to the public in advance of litigation." <u>Phillips</u>, 415 F.3d at 1322 (internal quotation omitted). A court should be cautious, however, not to rely too heavily on dictionaries, as the resulting construction may be too broad. <u>Id.</u> at 1321. Although "extrinsic evidence in general, and expert testimony in particular, may be used . . . to help the court come to a proper understanding of the claims[,] it may not be used to vary or contradict the claim language." <u>Vitronics</u>, 90 F.3d at 1584.

<u>DISCUSSION</u>

I.     <u>Level of Ordinary Skill</u>

Before the claims can be construed, the level of ordinary skill in the art must be determined. <u>Brookhill-Wilk</u>, 334 F.3d at 1298. Here, neither party has identified the person having ordinary skill in the art. The Federal Circuit has remanded cases for not properly or fully evaluating and considering the level of ordinary skill in the art during claim construction. <u>See</u> e.g. <u>Bayer AG v. Biovail Corp.</u>, 279 F.3d 1340, 1348 (Fed. Cir. 2002); <u>Neomagic Corp. v. Trident Microsystems, Inc.</u>, 287 F.3d 1062, 1074 (Fed. Cir. 2002).

Therefore, the court must first identify the level of ordinary skill in the art. The relevant art in these patents involves the use of computer hardware and software to aggregate content from a networked computer environment in order to create an on-line purchasing system, catalog, and

4

integrated interface. The focus is on the software programs and applications that visit sources, gather and parse information from the sources, and generate the content for the integrated online purchasing interface. Thus, the person having ordinary skill in the art in the instant action is defined as: someone with at least a bachelor's of science degree in a scientific or engineering field, such as computer science, electrical engineering, or physics, or someone with at least four years of experience working in the field of web or server application development. This definition is consistent with that ascertained in patent disputes involving related art. See Allvoice Computing PLC v. Nuance Commc'ns, Inc., 504 F.3d 1236, 1240 (Fed. Cir. 2007) ("someone who has a degree in computer science or something equivalent and 2–3 years experience programming in Windows" where the art related to voice-recognition software for personal computers); see also Data Race, Inc. v. Lucent Techs., Inc., 73 F. Supp. 2d 698, 747 n.330 (W.D. Tex. 1999) ("Bachelor of Science degree in electrical engineering, computer science or 3–5 years of recent experience in the field" where the art related to software and hardware for enabling a remote user to maintain a "virtual presence" at a corporate office); Katz v. AT & T Corp., 63 F. Supp. 2d 583, 594 n.2 (E.D. Pa. 1999) ("a person of ordinary skill in the art of interactive voice response systems would have had at least a Bachelor's degree in a scientific or engineering field, such as physics, electrical engineering, or computer science, and at least two years experience working in the field of computer telephony").

II.    Claim Construction

The following chart summarizes the court's construction of the disputed terms.  The full analysis supporting each construction is below.

| Term | Construction |
|------|--------------|
| "crawler" | A software program or programs which visit and search sources of content on a networked computer environment; have the capability to identify and gather information from the sources; and can include bots, robots, automated site searchers, and the like. |
| "electronically" | No construction necessary |
| "means for generating a crawler from a server interconnected to the network computer environment to visit the plurality of sources" | Subject to 35 U.S.C. § 112, ¶ 6.<br><br>FUNCTION: Generating a crawler to visit the plurality of sources.<br><br>CORRESPONDING STRUCTURE: A software product stored on computer readable media and executable by a computer, which is a server such as shopping server 20, and equivalents thereof. |

A.    "Crawler"[1]

| Claim Term | CNET's Proposed Construction | Etilize's Proposed Construction |
|------------|------------------------------|----------------------------------|
| Crawler | A software program or programs that operate to access servers on the Internet to gather uniform resource locaters ("URLs") or other information associated with the URLs, such as any software that performs searches of content over a network and can include "bots", "robots", "automated site searchers", and the like. | Software that automatically searches content over a network from Web server to Web server without human intervention or instruction. |

In the specification, the patentee attempted to define the term "crawler," by expressly setting forth that "[t]he term 'crawler' as used herein refers to any software that performs searches of content over a network and can include bots, robots, automated site searchers, and the like." '933 patent at 10:47–50; '426 patent at 8:58–61.[2]  When a patentee sets forth an explicit definition for a claim term, that definition will usually be dispositive.  Jack Guttman, Inc. v. Kopykake Enterprises, Inc., 302 F.3d 1352, 1360 (Fed. Cir. 2002) (citing Vitronics, 90 F.3d at 1582).  However, the "specification and other claims, must be examined to determine the meaning of terms in the claims."  Southwall Techs, 54 F.3d at 1576, cert. denied, 516 U.S. 987 (1995).

This explicit definition of crawler, standing alone, is not CNET's proposed construction, as CNET has added a prefatory clause to explain that the disclosed crawler accesses servers on the Internet to gather URLs and information associated with the URLs. Etilize's proposed construction departs from the definition altogether and adds limitations referring to "automatically," "from Web server to Web server," and "without human intervention or instruction." As explained below, the court rejects both parties' proposed constructions. Instead, the court determines that the term "crawler" is properly construed as "a software program or programs which visit and search sources of content on a networked computer environment; have the capability to identify and gather information from the sources; and can include bots, robots, automated site searchers, and the like."

First, it is apparent from the explicit definition, and undisputed by the parties, that a "crawler" is software that searches content over a network and examples include bots, robots, automated site searchers, and the like. See '933 patent at 10:47–50; '426 patent at 8:58–61. The specification also supports this construction. See '933 patent at 11:61–62, '426 patent at 10:17–18 ("crawlers 72 and 74 . . . are software programs"); '933 patent at 10:47–50; '426 patent at 8:58–61 ("[t]he term 'crawler' as used herein refers to any software that performs searches of content over a network and can include bots, robots, automated site searchers, and the like"); '933 patent at 10:58–62, 11:18–20 ("shopping server 20 may be used to aggregate product information from a plurality of sources connected to Internet 100 . . . [and] is operative to provide at least one crawler for visiting the plurality of sources"); '933 patent at 17:6–67, 18:1–9; '426 patent at 34:3–17 ("[the] present invention can be implemented over any type of communications channel, such as the Internet, a local area network (LAN), a wide area network (WAN), direct computer connections, or the like, using any type of communications hardware and protocols").

Second, although not apparent from the explicit definition, the specification reveals that a crawler not only searches content, but also visits a plurality of sources in order to search content from the sources and has the capability to identify and gather information from those sources. See '933 patent at 4:28–38 (causing a crawler "to visit the plurality of sources and gathering product phrase information from each of the plurality of sources via the crawler"); '933 patent at 11:38–44,

7

'426 patent at 9:60–66 ("[i]n the preferred embodiment, . . . crawler 72 and/or . . . crawler 74 may gather information . . . from each of the plurality of sources"); '426 patent at 11:11–15, '933 patent at 12:55–59 ("product literature crawler 72 may crawl through the plurality of linked Web pages . . . and in the present example, will further likely identify presence of the phrase 'computer'"); '933 patent at 18:48–65, claim 1 ("generating a crawler . . . to visit the plurality of sources; gathering product phrase information . . . ; and determining whether [the information is relevant]"); '426 patent at 14:7–11 ("like . . . crawler 72, . . . crawler 74 gathers product phrase information from merchant's Web page 42").

A person having ordinary skill in the art would also understand that the ability to identify and gather relevant information that is not already located on a database is what distinguishes a crawler from other software which merely searches content on networks. The parties' proposed constructions also support the court's determination that crawlers "gather" information. CNET's proposed construction includes a limitation that the crawlers "access servers on the Internet to gather" URLs, acknowledging the gathering function. At the <u>Markman</u> hearing, Etilize similarly suggested that its proposed construction might benefit from a substitution of the term "gather" for "search," changing Etilize's proposed construction to "software that automatically gathers content over a network from Web server to Web server without human intervention or instruction."

Third, it is apparent from both the explicit definition and the specification that crawlers search not only the Internet but also other types of computer networks. The definition uses the generic term "network," and the specification of both patents state that although the preferred embodiment of the invention functions on the Internet using a Web crawler, the invention is not so limited:

> [I]t should also be noted that one embodiment of the present invention has been described above where the Internet is the networked computer environment and the crawler is a Web crawler. . . . However, the present invention is not limited thereto and may be applied to other types of networked computer environments and other sources as well. The present invention can be implemented over any type of communications channel, such as the Internet, a local area network (LAN), a wide area network (WAN), direct computer connections, or the like, using any type of communications hardware and protocols.

8

'933 patent at 17:62–67, 18:1–9; '426 patent at 34:3–17.  Therefore, the relevant network where crawlers search is a "networked computer environment" because this is supported by the patent claims and specification.  '933 patent at 17:62–65; '426 patent at 34:3–6 ("it should also be noted that one embodiment of the present invention has been described above where the Internet is the networked computer environment and the crawler is a Web crawler"); '933 patent at 4:17–19 ("[i]t is another object of the invention to provide a method for efficiently gathering product information from a networked computer environment"); '426 patent at 37:59–63, claim 23 ("aggregating product information from a plurality of sources in a networked computer environment").

Because both parties' proposed constructions unnecessarily limit crawlers to Web crawlers that operate on a particular type of network—the Internet—these constructions are rejected.  Etilize attempts to limit the disclosed crawler to a specific type of crawler that searches "from Web server to Web server," effectively limiting the relevant network to the Web or Internet.  Etilize argues that this limitation is proper because this description is taken straight from the "Background of the Invention" section of both the '933 and '426 patents.  Defendant's Responsive Brief ("Resp.") at 4.  However, Etilize is cherry-picking language to support its position.  In the "Background of the Invention" section of both patents, this phrase is used to describe a typical crawler as a component of a search engine, not a crawler as claimed by either of the patents-in-suit.  See '933 patent at 2:40–67, 3:1–2; '426 patent at 1:46–67, 2:1–8 ("[s]earch engines typically have . . . a crawler . . . [that] automatically crawls from Web server to Web server").  In context, this particular phrase is not describing the crawlers that are disclosed in the patent claims.  This phrase is merely background information disclosing the state of the prior art related to crawlers; it is not intended to be an embodiment of, or a limitation on, the patented invention.  CNET's proposed construction similarly limits crawlers to software which "operate[s] to access servers on the Internet to gather uniform resource locators ('URLs')."  POB at 7.  However at the Markman hearing, CNET conceded that its proposed limitation improperly limited crawlers to those which search the Internet.

Moreover, limiting "crawlers" to Web crawlers—by adding the "Web server to Web server" requirement proposed by Etilize or by adopting CNET's proposed construction which includes

9

"Internet" and "URL" limitations—is improper because such a construction would render claim 15 of the '933 patent redundant and therefore unnecessary. Claim 1 of the '933 patent discloses "[a] method of aggregating product information for use in a product data base" which comprises a number of steps. '933 patent at 18:49–65. Claim 15 of the '933 patent is dependent on claim 1, and discloses "[t]he method of claim 1, wherein said networked computer environment is the Internet and said crawler is a Web crawler." '933 patent at 19:54–56. If the crawlers described in the '933 patent were limited to searching "Web servers" or "servers on the Internet," then claim 15 would be redundant by limiting crawlers to "Web crawlers." A claim term must be construed in light of the rest of the claims. See Phillips, 415 F.3d at 1315 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"). As a result, a construction of a term that would make claim 1 identical to claim 15 is improper.

Etilize inserts two additional limitations—"automatically" and "without human intervention"—both of which the court rejects. In support of its construction that crawlers search "automatically" Etilize focuses on language from the "Background of the Invention" and "Detailed Description" sections of both patents-in-suit. But just as Etilize cherry-picks language to support its proposed "Web server" construction, Etilize also cherry-picks language to support its "automatically" limitation. Etilize observes that the "Background of the Invention" section of both patents-in-suit states that "[the] crawler automatically crawls," highlighting the automatic language. '933 patent at 2:40–67, 3:1–2; '426 patent at 1:46–67, 2:1–8. In context, however, the background information simply discloses the state of the prior art related to crawlers and is not intended to be a limitation on the patented invention. Similarly, Etilize observes that the "Detailed Description" section of both patents-in-suit describe the crawlers as being automatic. The complete title of this section, however, is "Detailed Description *of the Preferred Embodiment*." '426 patent at 3:44–46 (emphasis added). The Federal Circuit has held that "an accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." Teleflex, 299 F.3d at 1327. The patentee makes it clear that the preferred embodiment is

10

**UNITED STATES DISTRICT COURT**
For the Northern District of California

simply an example set forth to enable a person having ordinary skill in the art to make and use the invention thereby satisfying the enablement requirement for patentability. The preferred embodiment is not a limitation, as the patentee explicitly states. See e.g. '933 patent at 15:25–27 ("whereas the above aspects of the present invention have been described as applied to computers, the present invention is not limited thereto"); '933 patent at 17:62–63, 18:2–3 ("one embodiment of the present invention has been described above . . . [h]owever, the present invention is not limited thereto").

Etilize next argues that the prosecution history supports its construction that the crawler "automatically" searches. In correspondence with the United States Patent and Trademark Office ("USPTO"), the patentee commented: "it should be clarified that as described in the Detailed Description, the method of the present invention allows substantially automated determination of whether a particular phrase is indicative of a product category or a product characteristic associated with the product category." Farooqui Dec. ¶ 6, Exh. E, '933 patent Response to Office Action at 16. The Response, however, was not limiting the claims to only automated crawlers. First, there is no indication that the "automated determination" is specifically referring or limiting itself to determination via crawlers. Second, the patentee noted that "the method of the present invention allows substantially automated determination." This is an open-ended construction because it uses the term "allows." Id. The patentee did not choose to state that "the method of the present invention is limited to" or "the method of the present invention is only embodied by" automated crawlers. Even assuming, *arguendo*, that the patentee had intended to limit the claims to automated searching via crawlers, which this court believes it did not, the patentee added the modifier "substantially." Thus, crawlers which automatically search would be encompassed by the claims, as would crawlers which are not fully automatic.

The final limitation that Etilize proposes in its construction relates to a crawler that operates "without human intervention or instruction." Etilize argues that because the purpose of the patents-in-suit is "to avoid the arduous task of having human operators search through millions of Web pages with various content," this purpose supports its construction that the crawlers operate "without

human intervention or instruction." Resp. at 8. Etilize adds that because the crawler utilizes computational linguistics to achieve this purpose, it necessarily must operate without human intervention or instruction. Id. It is undisputed that the patents-in-suit have an objective to avoid having human operators search through the Internet for content, and it is undisputed that the claimed crawlers utilize computational linguistics to gather product phrase information. However, the crawlers are not intended or claimed as software which operate perpetually, without any human intervention or instruction. Neither patent disclaims human initiation of the crawler search. Additionally, neither patent discloses methods for terminating a crawler search or modifying, reconfiguring, or monitoring search functions and settings. Human instruction, intervention, and initiation are not disclaimed, and therefore Etilize's limiting construction is improper.

In sum, the court rejects both parties' proposed constructions. Both parties attempt to limit the disclosed crawler to one that operates on a particular type of networked computer environment, namely the Internet. This limitation is not supported by the express definition or the claims and specification. Moreover, Etilize's attempt to limit the disclosed invention to a crawler that operates "automatically" and "without human intervention or instruction" imposes limitations that are not supported by the intrinsic evidence. Combining the express definition of crawler with other intrinsic evidence demonstrating that the crawler not only searches, but also visits sources and identifies and gathers information, the court arrives at a proper construction of the term "crawler." The court construes "crawler" as "a software program or programs which visit and search sources of content on a networked computer environment; have the capability to identify and gather information from the sources; and can include bots, robots, automated site searchers, and the like."

B.     "Electronically"[3]

| Claim Term | CNET's Proposed Construction | Etilize's Proposed Construction |
|---|---|---|
| Electronically (comparing, parsing, generating) | Performed in a large or considerable degree by a computer program or electronic device | Performed for the most part automatically by a computer program |

The parties' disagreement over a proper construction of the term "electronically" centers on whether the claimed activities are automatic and whether the activities may be performed by an electronic device, as opposed to a computer.  The "ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314; see generally United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir.1997) ("[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy").

"Electronically" need not be construed because it is neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history.  Accord z4 Tech., 507 F.3d at 1351 (affirming district court's decision to not construe "electronic" in patents for prevention of software piracy because claims and specification "clearly contemplate[ ] a user choice as to whether registration will be automatic or manual"). The term will not be unfamiliar to the jury since "electronically" is a familiar and commonplace word that is used in everyday language by lay jurors. The term is not confusing because the lay meaning of electronic is the same meaning as that which a person having ordinary skill in the art would attribute to the term.

Furthermore, there is no evidence that the specification or the prosecution history intended that a different meaning attach to this term.  Although Etilize proposes that the electronically parsing, comparing, and generating steps are "automatic," the prosecution history of the '426 patent discloses that the patentee intended the ordinary meaning of "electronically."  During prosecution of

UNITED STATES DISTRICT COURT
For the Northern District of California

the '426 patent, the USPTO cited U.S. Patent No. 5,231,566 ("the '566 patent" or "Blutinger") as

prior art defeating patentability under 35 U.S.C. section 102. Michael Dec., Exh. 4 at 4–5. The

examiner stated:

> As to claims 1 and 45 [of the '426 patent application], Blutinger teaches a data
> processing system comprising: [a number of steps]. Note: some of these steps or
> elements are preformed [sic] manually in Blutinger's system however, the language
> of the claims [of the '426 patent application] is considered broad enough to include
> manual operations.

Id. at 5. The patent applicant attempted to distinguish Blutinger by explaining that the comparing,

parsing, and generating steps of the '426 patent claims are "performed electronically, not manually."

Michael Dec., Exh. 5 at 28. The applicant added:

> However, to expedite the prosecution of the present application, independent claims
> 1, 23, and 45 have been amended to specifically recite electronic comparing . . . .
> In addition, these claims have been further amended to specifically recite
> electronically parsing . . . . Furthermore, these claims have been also amended to
> specifically recite electronically generating . . . . Clearly, the cited Blutinger
> reference fails to disclose, teach, or otherwise suggest the method and system as
> recited in these amended claims.

Id. at 29. The patentee added the term "electronically" to the claims of the '426 patent during

prosecution in order to explicitly distinguish it from the Blutinger reference, which utilized manual

operations, rather than specifically disclaiming any and all manual operations.[4] See Teleflex, 299

F.3d at 1327 ("[w]e hold that claim terms take on their ordinary and accustomed meanings unless the

patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim

term by redefining the term or by characterizing the invention in the intrinsic record using words or

expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope").

The parties' disagreement boils down to a simple definitional problem. CNET takes the

position that the addition of the term "electronically" simply distinguished the '426 patent from

systems which wholly utilize mental processes to compare, parse, and generate content. While

Etilize takes the position that in order to fully distinguish the '426 patent claims from Blutinger, the

processes must necessarily be "automatic" or not involving human interaction at any level. The '426

patent is directed to a method and system for aggregating content for an on-line catalog system

14

1   utilizing computer hardware and software to complete the tasks that Blutinger left to mental

2   processes. '426 patent at 1:19–21. This method of comparing, parsing, and generating content is

3   distinct from Blutinger's method which utilizes wholly mental processes to input, compare, match,

4   and assign, and the addition of the term "electronically" was intended to convey such a distinction.

5   "Electronically" directly embodies the distinction between the Blutinger reference and the '426

6   patent, and it was the term chosen by the applicant to exhibit that distinction.

7          Additionally, CNET disputes Etilize's proposed construction by arguing that the written

8   descriptions "consistently contemplate[] human resources interacting with the computing device."

9   POB at 12. The specifications disclose that human interaction may be added to, or take the place of,

10  1) category database 79, '426 patent at 11:26–29 ("in addition to, or as an alternative to category

11  database 79, a human verification process may be provided"); 2) validation tool 93, '933 patent at

12  16:46–47 ("validation tool 93 may preferably be executed by a human editor"); 3) property

13  definition tool 80, '426 patent at 11:67, 12:1–2 ("property definition tool 80 is executed by a human

14  editor"); and 4) product record creation tool 95, '933 patent at 16:64–65 ("the product record

15  creation tool 95 may preferably be executed by a human editor"). What is unclear from the

16  specification, however, is how these elements of the preferred embodiment fit into the methods and

17  systems claimed in the '426 patent and therefore align—or do not align—with the electronically

18  comparing, parsing, and generating steps.

19         During the <u>Markman</u> hearing, CNET claimed that these tools, disclosed in the specifications

20  to include human interaction, directly link up to the electronically comparing, parsing, and

21  generating steps. Although the court has been unable to draw such an unclouded conclusion based

22  on its reading of the patents, these links are disclosed in the parties' joint claim constructions. The

23  four means-plus-function constructions that include the electronically comparing, parsing, and

24  generating steps are linked to the aforementioned tools. <u>See</u> Farooqui Dec. ¶ 10, Exh. I, <u>Joint Claim</u>

25  <u>Construction and Prehearing Statement Pursuant to Patent Local Rule 4-3</u> at 4–5. Because the

26  parties have agreed on these constructions, it now seems disingenuous for Etilize to argue that the

27  human intervention arises only after the electronic steps have occurred. Resp. at 10. At the

28

15

<u>Markman</u> hearing, Etilize similarly attempted to argue that the human interaction is in the monitoring steps, not the processing, and that the processing is necessarily automatic. However, this is similarly wrong because property definition tool 80, discussed above, determines whether product phrase information is a relevant characterization of the product or product category. '426 patent at 11:65–67. This determination is plainly a part of the processing step and not part of the monitoring function.

In sum, the specification does not disclose what level of automation is intended by use of the term "electronically." The term "electronically" was chosen to distinguish the patent application from prior art which taught a completely manual method of creating a catalogue. As a result, this term was intended to distinguish completely manual operations. The ordinary, customary, and common meaning of "electronically" does just that. For all of these reasons, the court holds that the term "electronically" does not require construction.

C.   "<u>Means for generating a crawler from a server interconnected to the network computer environment to visit the plurality of sources</u>"[5]

| Claim Term | CNET's Proposed Construction | Etilize's Proposed Construction |
|---|---|---|
| Means for generating a crawler from a server interconnected to the network computer environment to visit the plurality of sources | Subject to 35 U.S.C. § 112, ¶6.<br><br>FUNCTION: Generating a crawler from a server interconnected to the network computer environment to visit the plurality of sources.<br><br>CORRESPONDING STRUCTURE: A software product stored on computer readable media and executable by a computer, which is a server such as shopping server 20, and equivalents thereof. | Claim invalid under 35 U.S.C. § 112, ¶2. Corresponding structure does not exist. |

Section 112 of the Patent Act authorizes the use of means-plus-function claims. A means-plus-function claim is "expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112. A claim recited in means-plus-function language "encompasses the corresponding structure and its equivalents," while a claim that recites the structure does not encompass the equivalents. <u>Festo</u>

Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 234 F.3d 558, 589 (Fed. Cir. 2000) (en banc), rev'd on other grounds, 535 U.S. 722 (2002), on remand, 344 F.3d 1359 (Fed. Cir. 2003), cert. denied, 541 U.S. 988 (2004) (citing Laitram Corp. v. Rexnord Inc., 939 F.2d 1533, 1536 (Fed. Cir. 1991)). The term "means" is central to a means-plus-function analysis. Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004) (citing CCS Fitness, 288 F.3d at 1369). A claim limitation that actually uses the word "means" invokes a rebuttable presumption that section 112 applies. Lighting World, 382 F.3d at 1358. Conversely, a claim limitation lacking the term "means" invokes a rebuttable presumption that section 112 does not apply. Id.

When a patent-drafter chooses to draft a patent claim in means-plus-function format, claim construction rules differ from the rules used for other types of patent claims. Section 112 provides that a means-plus-function claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112. Construing means-plus-function claims is a two step process. The first step is to identify the claimed function. Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1333 (Fed. Cir. 2004) (citing Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001)). The second step is to identify the corresponding structure in the specification. A means-plus-function claim is limited to structures expressly disclosed in the specification and corresponding equivalents. Symbol Techs, Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991). This means that the rest of the patent specification must be consulted to determine the structure, material, or acts corresponding to the function recited in the claim.

When the specification discloses structure, it will be "deemed to be corresponding structure if the specification clearly links or associates that structure to the function recited in the claim." Kahn v. General Motors Corp., 135 F.3d 1472, 1476 (Fed. Cir. 1998). The Federal Circuit has explained:

> [t]he price that must be paid for use of [the] convenience [of claiming in means-plus-function format] is limitation of the claim to the means specified in the written description and equivalents thereof. If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the

UNITED STATES DISTRICT COURT
For the Northern District of California

patentee has not paid that price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification. Such is impermissible under the statute.

Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

Sitting en banc, the Federal Circuit has emphasized the importance of purely functional claim language when dealing with means-plus-function format. Phillips, 415 F.3d at 1312 ("[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function"). Although the term "means" in a claim raises the presumption that the claim is in means-plus-function format, Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1375 (Fed. Cir. 2003), a claim which recites structure sufficient to perform the claim's function in its entirety is not construed pursuant to section 112, paragraph 6. Id. A recitation of sufficient structure will overcome the presumption that arises from use of the term "means." Id.

As a threshold matter, the parties do not dispute that this term is in means-plus-function format because the disputed term explicitly uses the word "means." Nevertheless, the court acknowledges that an issue exists regarding whether the claims-at-issue recite sufficient structure to negate the application of section 112, paragraph 6. At the Markman hearing, CNET also recognized the possibility of this issue. CNET argues that the function disclosed in the claim is "generating a crawler from a server interconnected to the network computer environment to visit the plurality of sources."[6] However this language discloses something more than mere function. The function disclosed is "generating a crawler to visit the plurality of sources." The rest of the language—from a server interconnected to the network computer environment—does not describe function; it describes structure. This language closely parallels CNET's proposed corresponding structure—a software product stored on computer readable media and executable by a computer, which is a server such as shopping server 20, and equivalents thereof. POB at 13; Reply at 8. Corresponding structure that is explicitly disclosed in the claim can rebut the presumption that section 112 applies. Altiris, 318 F.3d at 1375. However, because the parties do not dispute that this term is in means-plus-function format and because neither party has briefed the issue, the court will construe this term

18

1  based on the presumption that section 112 applies. Nonetheless, the following construction is

2  subject to reconsideration upon a motion and further briefing on this issue.

3      Presuming this claim is in means-plus-function format, the function identified by this claim

4  term is "generating a crawler to visit the plurality of sources." As discussed above, CNET identified

5  this function in the <u>Markman</u> hearing, though CNET also included non-functional language in its

6  proposed construction in the briefs. CNET identifies the corresponding structure to be "a software

7  product stored on computer readable media and executable by a computer, which is a server such as

8  shopping server 20, and equivalents thereof." CNET argues that the function of generating a crawler

9  is clearly linked to the corresponding structure—a server such as shopping server 20 disclosed in the

10  specification. POB at 15 ("the specification expressly states that the crawler is generated by a server

11  such as shopping server 20 to visit the plurality of sources") (citing the '426 patent at

12  9:39–41, 14:6–7).

13      The patent specification clearly links shopping server 20, in the preferred embodiment, to the

14  function of generating a crawler. The '426 patent specification provides: "[i]n accordance with the

15  preferred embodiment, shopping server 20 is operative to provide at least one crawler for visiting the

16  plurality of sources," '426 patent at 9:39–41, and "product offerings crawler 74 [] may also be

17  generated by shopping server 20," <u>id.</u> at 14:6–7. In addition, the form of CNET's proposed

18  corresponding structure is identical to those agreed upon by the parties. <u>See</u> Michael Dec., Exh. 3,

19  Exh. A at 3, Parties' Agreed Upon Construction, ("CORRESPONDING STRUCTURE: A software

20  product stored on computer readable media and executable by a computer, which is . . . "). As such,

21  this format is appropriate and seemingly agreeable to the parties.

22      A person having ordinary skill in the art at the time the '426 patent was issued would know

23  that a server connected to a network is a sufficient and customary means for generating a crawler to

24  visit locations on a computer network. At the time the '426 and '933 patents were in prosecution,

25  crawlers were disclosed in the prior art. <u>See</u> Michael Dec., Exh. 4 at 8 ("Call does detail generating

26  a crawler") (internal quotations omitted); <u>id.</u> ( "Kirsch disclosed the invention substantially as

27  claimed including . . . generating a crawler") (internal quotations omitted). A person having

28

1  ordinary skill in the art would know that crawlers could be generated by servers.[7]  Therefore, the

2  proper construction of this term includes a corresponding structure that is "a software product stored

3  on computer readable media and executable by a computer, which is a server such as shopping

4  server 20, and equivalents thereof," which is clearly linked in the specification to the claimed

5  function.

6       Etilize argues that the '426 patent does not disclose how the crawler is created or originated,

7  but merely discloses where the crawler resides.  This argument neglects the nature of crawlers and

8  servers.  Generally a server system is made up of hardware and server software.  See '426 patent at

9  8:31–44, 34:18–31 ("a server may be comprised of a plurality of redundant computers . . . [a]ny

10  appropriate server . . . software can be used").  As discussed above, a crawler is also software.  See

11  section II(A), supra.  Although the patent does not disclose how server software would specifically

12  generate crawler software to search, identify, and gather content, such a disclosure is unnecessary

13  because a person having ordinary skill in the art at the time the patent was issued would have known

14  how a server would generate a crawler.  The Federal Circuit has explicitly held that subject matter

15  known to persons having ordinary skill in the art is preferably omitted from patent specifications.

16  Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1534 (Fed. Cir. 1987) (citing Hybritech Inc.

17  v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384 (Fed. Cir. 1986)); see also S3 Inc. v. NVIDIA

18  Corp., 259 F.3d 1364, 1371 (Fed. Cir. 2001) ("patent documents need not include subject matter that

19  is known in the field of the invention and is in the prior art, for patents are written for persons

20  experienced in the field of the invention") (internal citations omitted).

21       Finally, at the Markman hearing, Etilize took issue with the patentee's use of the word

22  "generating."  Since this argument was not explicitly in Etilize's brief, it is not completely clear

23  what Etilize asserts.  Etilize seems to argue that "generating" software—a crawler or

24  crawlers—means creating or compiling the software.  It is untenable that Etilize would expect this

25  court to even consider that a person having ordinary skill in the art at the time the '426 patent was

26  issued would consider "means for generating a crawler" to mean compiling or creating the software.

27  That is such a constricted reading of the claim term that it is incongruous with Federal Circuit

28

precedent, which holds that courts may presume the patent examiner gave terms the broadest reasonable interpretation consistent with the specification. <u>Rexnord Corp. v. Laitram Corp.</u>, 274 F.3d 1336, 1347 (Fed. Cir. 2001); <u>see also</u> <u>In re Hyatt</u>, 211 F.3d 1367, 1372 (Fed. Cir.2000) ("during examination proceedings, claims are given their broadest reasonable interpretation consistent with the specification"); Manual of Patent Examining Procedure § 2111 ("Claim Interpretation; Broadest Reasonable Interpretation").

In sum, this court holds that "a software product stored on computer readable media and executable by a computer, which is a server such as shopping server 20, and equivalents thereof" is of well-known structure and performs the function of "generating a crawler to visit the plurality of sources."

<u>CONCLUSION</u>

For the foregoing reasons, the court construes the disputed claims as described above.

IT IS SO ORDERED.

Dated: March 3, 2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

1.	The term "crawler" is contained in claims 1, 15, 28, and 36 of the '933 patent and claims 20, 23, 24, 52, and 95 of the '426 patent.  The independent claims are claims 1 and 28 of the '933 patent and claims 52 and 95 of the '426 patent.

2.	It is undisputed that the term "crawler," as used in both patents, refers to the same software program or programs.  Not only do both patents disclose the same explicit definition of crawler, demonstrating the patentee's understanding that the crawlers in both patents are the same crawler, but both patents also utilize the crawlers in the same manner.  For this reason, and for simplicity, the court will not distinguish between the '933 and '426 patents when construing the term "crawler."

3.	The term "electronically" is contained in claims 1, 39, 52, 60, and 95 of the '426 patent.  These are all independent claims.

4.	It is important to note that since the term "electronically" was added during prosecution as a means of distinguishing the '426 patent from the prior art, the term appears nowhere in the specification.  It only appears in the claims of the '426 patent.

5.	The term "means for generating a crawler from a server interconnected to the network computer environment to visit the plurality of sources" is contained in claim 95 of the '426 patent.  This is an independent claim.  Plaintiff asserts that claim 60 of the '426 patent also includes this term, but it does not.

6.	At the <u>Markman</u> hearing, CNET recognized that the true function presented in this claim term is "generating a crawler to visit a plurality of sources."

7.	<u>See</u> <u>e.g.</u> Roland Tretau & Ana Lelescu, IBM WebFountain and WebFountain Appliance Overview at 3 (Oct. 22, 2004) (in a white paper published by IBM in 2004, WebFountain, which is a data mining and discovery tool that includes a crawler, is described as being "implemented as a set of . . . modules running on a distributed cluster of servers").

UNITED STATES DISTRICT COURT
For the Northern District of California